# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **WILLIAM FLOYD CARTWRIGHT** | ) | |
| **#352873,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **NO. 2:20-cv-00055** |
| **v.** | ) | |
| | ) | |
| **SHAWN P. PHILLIPS,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

William Floyd Cartwright filed a pro se petition under 28 U.S.C. § 2254 for a writ of habeas corpus (Doc. No. 1), Respondent filed an Answer (Doc. No. 13), and Petitioner filed a Reply. (Doc. No. 14). For the following reasons, Petitioner is not entitled to relief under Section 2254 and this case will be dismissed.

## I.      Procedural Background

A Putnam County grand jury indicted Petitioner and co-defendant Christopher Servo in connection with the killing of Marvin Martin, Jr., in August 2004. Petitioner faced a first-degree murder charge, and Servo faced charges for facilitation and being an accessory after the fact. (Doc. No. 12-1 at 5–6). Petitioner and Servo were tried together, but after the closing of proof, Servo pleaded guilty to a lesser charge. <u>Cartwright v. State</u>, No. M2018-01544-CCA-R3-PC, 2020 WL 1867042, at *1 (Tenn. Crim. App. Apr. 14, 2020). The jury convicted Petitioner as charged, and he received a sentence of life imprisonment. (Doc. No. 12-1 at 230). The Tennessee Court of Criminal Appeals (TCCA) affirmed the judgment, and the Tennessee Supreme Court denied Petitioner's application for permission to appeal. <u>State v. Cartwright</u>, No. M2007-00500-CCA-R3-CD, 2008 WL 902093 (Tenn. Crim. App. Apr. 3, 2008); (Doc. No. 12-17).

Petitioner filed a post-conviction petition (Doc. No. 12-18 at 3–7), followed many years later by an amended petition (id. at 12–19) and an evidentiary hearing.[1] (Doc. No. 12-19). The court denied relief. (Doc. No. 12-18 at 29–31). The TCCA affirmed, and the Tennessee Supreme Court denied discretionary review. Cartwright, 2020 WL 1867042; (Doc. No. 12-32).

## II.    Factual Background

On post-conviction appeal, the TCCA summarized the evidence presented against Petitioner at trial as follows:

> On the evening of August 27, 2004, the victim was at the Cookeville home of Lakeisha Darty. He was there drinking, along with Ms. Darty and her two roommates, Sherry Rooks and Tiffiney Reagan. Ms. Reagan and the Petitioner were involved in an affair at the time. At some point in the evening, Ms. Darty left the residence and went to a local bar where she encountered the Petitioner, Ms. Darty's cousin by marriage. The victim stayed at the house that evening, as did Ms. Rooks and Ms. Reagan.
>
> When the bar closed in the early morning hours of August 28, 2004, Ms. Darty drove home, and she was accompanied by her friend Jennifer Vinson, the Petitioner, and Josh Cartwright ("Mr. Cartwright"), "another of their cousins." According to Ms. Darty, when they left the bar, the Petitioner did not appear intoxicated, but he "was upset with [Mr.] Cartwright for 'disrespecting' their grandmother." At one point, the Petitioner hit Mr. Cartwright, leaving blood in Ms. Darty's car. The Petitioner "said, in reference to disrespect of his grandmother, he never wanted to see 'that' again." The group arrived at Ms. Darty's house "where [the Petitioner] continued to push [Mr.] Cartwright around in the yard."
>
> Ms. Darty went to wake up Ms. Reagan. When Ms. Reagan awoke, she saw the Petitioner, "whom she described as 'very drunk,' arguing with [Mr.] Cartwright, who had blood on his face." The victim intervened and told the Petitioner to leave

---

[1] Regarding the unusual delay in Petitioner's post-conviction proceedings, the TCCA wrote:

> It is unclear why over nine years elapsed between the Petitioner's filing of his original petition for post-conviction relief and the evidentiary hearing occurring. Such a lengthy delay is inexcusable. We note that trial judges have an obligation to manage their dockets in a timely manner, see Tennessee Supreme Court Rule 10, Rule of Judicial Conduct 2.5, and defense lawyers and prosecutors have an ethical obligation to make reasonable efforts to expedite litigation, see Tennessee Supreme Court Rule 8, Rule of Professional Conduct 3.2.

Cartwright, 2020 WL 1867042, at *4.

Mr. Cartwright alone. The Petitioner responded by hitting the victim in the face, "knocking the victim's glasses from his face[,] and telling him that this was none of his business but was family business." Ms. Darty helped the victim find his glasses, and then she left to drive Ms. Vinson home.

Thereafter, the Petitioner received a phone call, and Ms. Reagan heard him say, "I'm at Tiffiney's, you need to get over here right now." Ms. Reagan saw the following events transpire next:

> Ms. Reagan . . . saw [the Petitioner] "just turn around and hit" the victim, who had not touched [the Petitioner] to this point. [Ms.] Reagan saw the two move to the side of the house, and she saw [the Petitioner] pull the victim's shirt off. She heard the victim say, "Tug, that's enough, please stop, I didn't do anything." [FN: The Petitioner's nickname was "Tug."] [Ms.] Reagan said, thereafter, she saw mostly shadows and silhouettes, and she heard someone hit the car. She next saw [the Petitioner] kicking and "stomping" on the victim in the front yard. [Ms.] Reagan said that, approximately three times, she yelled "Tug, that's enough, stop," prompting [the Petitioner] to walk away briefly but return to beating the victim. [Ms.] Reagan never saw the victim attempt to defend himself.
>
> At that point, [Ms.] Reagan went and awakened [Ms.] Rooks, telling her that [the Petitioner] was "beating up" the victim. When [Ms.] Reagan came back to the doorway of the front porch, she saw [the co-defendant] standing on the porch. [The Petitioner] was still stomping on the victim's head, and the victim had his stomach down on the ground.

According to Ms. Rooks, she was going to call 9-1-1, but both the co-defendant and Ms. Reagan told her that "it wasn't that bad, that everything was okay." Nonetheless, Ms. Rooks went inside the house and called Ms. Darty, telling her to get there quickly.

Ms. Reagan observed the Petitioner tell the co-defendant to come and help him, and they tried to carry the victim out of the yard. Ms. Reagan continued,

> They could not and ended up dragging him by his feet, face down, toward the porch. When they placed the victim on the porch, [the Petitioner] appeared to be grabbing at the victim's clothes, perhaps in an attempt to take his shorts off. Ms. Reagan noticed that [the Petitioner's] silver Reeboks were covered in blood. [The Petitioner] then grabbed the victim's hands and dragged him into the shed. The victim was, at first, sitting in the shed, and [the Petitioner] pushed him onto his side.

3

Thereafter, Ms. Darty arrived and attempted to approach the Petitioner, but Ms. Reagan told her to wait because they did not know what the Petitioner would do. When the Petitioner left the shed and walked away, Ms. Darty ran to the shed and pulled the victim out from inside. Ms. Darty yelled to Ms. Rooks for help because she could not find the victim's pulse. The two women began performing CPR, and after doing so, Ms. Rooks felt a faint pulse. Although Ms. Darty called 9-1-1, they decided to drive the victim to the hospital, so she hung up. As the women were attempting to load the victim into Ms. Reagan's SUV, the Petitioner, who appeared uninjured, returned and assisted them. The Petitioner "told the girls to say that they found the victim in their yard in his present condition" and instructed them that they "better not say what happened." The Petitioner "also told [Ms.] Reagan not to take the victim to the hospital if he did not have a pulse. They were all scared of what [the Petitioner] might do if they told the truth."

Richard G. Clark, a staff physician in the emergency room at Cookeville Regional Medical Center, testified that he retrieved the victim from Ms. Reagan's vehicle but could not find a pulse. After unsuccessfully performing "advanced life support measures[,]" the doctor pronounced the victim dead at 4:07 a.m. Dr. Clark said that he "could tell from the injuries that the victim had suffered some blunt trauma to the face and body, along with skin abrasions consistent with being dragged across concrete."

When Ms. Reagan was informed of the severity of the Petitioner's injuries, she called the Petitioner. However, the co-defendant answered and said that the Petitioner was sleeping. Ms. Reagan informed the co-defendant that the victim was dead. The Petitioner and the co-defendant then fled to Lebanon, Tennessee to stay with a friend, Frederick Lashane Garrett. They arrived at Mr. Garrett's home later in the day on August 28, 2004. According to Mr. Garrett, while there, the Petitioner told him "that he had gotten into a fight where he punched, kicked, and slammed a guy around and said he was laughing while beating the man." The Petitioner and the co-defendant were later apprehended in Nashville on August 31, 2004, while they were en route to the Clarksville bus station "to catch a bus."

Detective Carl Sells, with the Cookeville Police Department, "interviewed the women." He stated that the women "were not initially truthful with him about what had happened, telling him they found the victim lying in their front yard and someone must have left him there." However, he opined that later, they all gave "full statements consistent with their trial testimony."

Upon processing the crime scene, "the victim's blood was found on a welcome mat on the porch, in the grass in the front yard, and in two places in the shed." Also, "[t]he victim's glasses, and a lens separated from those glasses, and the victim's shirt were found near the house." Additionally, "[t]he morning after the beating, [Ms.] Rooks had noticed a new dent in the driver's side right fender of her car, which had been parked near where the beating occurred . . . . [A] sample was taken

of what appeared to be dried bodily fluid on the fender, but the test results returned inconclusive."

Dr. Feng Li, the medical examiner, testified to the following regarding the victim's injuries and cause of death:

> [A]n external examination of the victim's body revealed he suffered injuries 'all over the body.' The victim had areas of abrasions, contusions, and lacerations to multiple areas of his body. The victim's skull bone was fractured, and he had orbital bruises. The victim's injuries were the result of blunt force, and a combination of these injuries resulted in his death. The doctor opined that the most severe injuries were the skull f[r]actures and hemorrhages. The victim's injuries were consistent with his head being stomped upon while he lay on the ground. The doctor said that the victim suffered 'brush burns,' which were consistent with the victim being dragged across concrete.

Dr. Li stated that he measured the victim and that the victim was five-feet, four-inches tall. In addition, the victim's blood alcohol level was determined to be between .15 and .19; no drugs were detected in his system. Dr. Li admitted "that the victim's blood alcohol level was over twice the legal driving limit in Tennessee."

Cartwright, 2020 WL 1867042, at *1–3 (internal citations omitted).

## III.   Claims

Petitioner asserts the following claims:

1.      Trial counsel was ineffective for failing to:

     A.      Object to a jury instruction given at the beginning of trial (Doc. No. 1 at 17–18);

     B.      Request a new preliminary hearing (id. at 18–20);

     C.      Introduce evidence consistent with his opening statement (id. at 21);

     D.      Properly question the medical examiner regarding the cause of death (id. at 22–23);

     E.      Move to re-open the proof and call co-defendant Servo to testify (id. at 23–24);

     F.      Assist Petitioner in such a way as to amount to cumulative error (id. at 25–26);

     G.      Obtain a mental evaluation of Petitioner in pursuit of a diminished-capacity argument (id. at 27–29); and

H.      Raise the defense of voluntary intoxication. (*Id.* at 29–30).

2.      There was insufficient evidence to support Petitioner's conviction. (*Id.* at 6, 32–40).

## IV.    Legal Standard

Federal habeas relief for state prisoners is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA sets a very high bar for granting federal relief on claims "adjudicated on the merits" in state court. Harrington v. Richter, 562 U.S. 86, 97 (2011). Under AEDPA, such a claim cannot be the basis for federal relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" Hill v. Curtin, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting Lockyer v. Andrade, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (quoting Harris v. Haeberlin, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"; instead, the federal court must find that the state court's application was "objectively unreasonable." Id. (quoting Wiggins v. Smith, 539 U.S. 510, 520–21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations are unreasonable only "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." Pouncy v. Palmer, 846 F.3d 144, 158 (6th Cir. 2017) (quoting Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." Rice v. White, 660 F.3d 242, 250 (6th Cir. 2011) (citing Byrd v. Workman, 645 F.3d 1159, 1172 (10th Cir. 2011)).

Review of claims rejected on the merits in state court, however, is ordinarily only available to petitioners who "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In Tennessee, a petitioner can exhaust all available state remedies for a claim by presenting it to the TCCA. Adams v. Holland, 330 F.3d 398, 402 (6th Cir. 2003) (citing Tenn. Sup. Ct. R. 39). "To be properly exhausted, each claim must have been 'fairly presented' to the state courts," meaning that the petitioner presented "the same claim under the same theory . . . to the state courts." Wagner v. Smith, 581 F.3d 410, 414, 417 (6th Cir. 2009) (citations omitted).

The procedural default doctrine is an "important corollary" to the exhaustion requirement. Davila v. Davis, 137 S. Ct. 2058, 2064 (2017) (citations omitted). It prevents a federal habeas court from reviewing "federal claims that . . . the state court denied based on an adequate and independent state procedural rule." Id. A claim also may be "technically exhausted, yet procedurally defaulted" where "a petitioner fails to present a claim in state court, but that remedy

7

is no longer available to him." Atkins v. Holloway, 792 F.3d 654, 657 (6th Cir. 2015) (citing Jones v. Bagley, 696 F.3d 475, 483–84 (6th Cir. 2012)).

To obtain review of a procedurally defaulted claim, a petitioner must "establish 'cause' and 'prejudice,' or a 'manifest miscarriage of justice.'" Middlebrooks v. Carpenter, 843 F.3d 1127, 1134 (6th Cir. 2016) (citing Sutton v. Carpenter, 745 F.3d 787, 790–91 (6th Cir. 2014)). "Cause" has been described as "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." Davila, 137 S. Ct. at 2065 (citations omitted). "Prejudice" means that the errors must have resulted in "actual and substantial disadvantage, infecting [the petitioner's] entire trial with error of constitutional dimensions." Garcia-Dorantes v. Warren, 801 F.3d 584, 598 (6th Cir. 2015) (internal citations and quotation marks omitted). And the manifest-miscarriage-of-justice exception applies "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." Dretke v. Haley, 541 U.S. 386, 392 (2004) (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)).

## V.    Analysis

Respondent argues that Petitioner's claims are either without merit under AEDPA's demanding standard of review for claims adjudicated on the merits in state court, or procedurally defaulted without cause. (Doc. No. 13 at 22–38). The Court agrees.

### A.    Claims Adjudicated on the Merits

The claims adjudicated on the merits by the TCCA include six ineffective-assistance claims and an insufficient-evidence claim. AEDPA deference applies to these decisions.

#### 1.    Ineffective Assistance of Counsel

Petitioner asserts that trial counsel was ineffective in several ways. The TCCA correctly identified the federal standard governing ineffective-assistance claims, as set forth in Strickland v.

8

Washington, 466 U.S. 668 (1984), before rejecting Petitioner's claims on the merits. Cartwright, 2020 WL 1867042, at *8–15.

Under Strickland, a petitioner must show (1) deficient performance and (2) prejudice to the defendant. Knowles v. Mirzayance, 556 U.S. 111, 124 (2009) (citing Strickland, 466 U.S. at 687). Counsel's performance is deficient where it falls "below an objective standard of reasonableness." Strickland, 466 U.S. at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (citing Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Further, when a petitioner raises an exhausted claim of ineffective assistance in a federal habeas petition, "[t]he pivotal question" is not "whether defense counsel's performance fell below Strickland's standard," but "whether the state court's application of the Strickland standard was unreasonable." Harrington, 562 U.S. at 101. This amounts to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 571 U.S. 12, 15 (2013) (quoting Cullen v. Pinholster, 563 U.S. 170, 190 (2011)).

### a. Claim 1.A—Jury Instruction

At the beginning of trial, the court gave the following preliminary instruction to the jury:

> I will decide which rules of law apply to this case. My decisions will be reflected
> in my responses to questions and objections the attorneys raise during the trial as
> well as in my final jury instructions.

9

It is your job to determine what the facts of this case are. You must then apply the law that I give you in the instructions to the facts in this case and from that application you will arrive at your verdict.

(Doc. No. 12-2 at 26). In Claim 1.A, Petitioner asserts that trial counsel should have objected to this instruction because it was "incorrect." (Doc. No. 1 at 17).

The TCCA rejected the premise of this claim, ruling that counsel was not ineffective for failing to object because the challenged instruction was a correct statement of the law. Cartwright, 2020 WL 1867042, at *9–10. This ruling was reasonable, as the challenged instruction was consistent with Tennessee Pattern Preliminary Jury Instruction 1.00, which was, in turn, consistent with long-standing Tennessee law. See State v. Lawson, No. E2018-01566-CCA-R3-CD, 2019 WL 4955180, at *6 (Tenn. Crim. App. Oct. 8, 2019) ("It is the duty of the court to direct the jury what the law is, and it is the duty of the jury to apply it, under the direction of the court, so far as he has directed, to the facts in evidence." (quoting Ford v. State, 47 S.W. 703, 704 (Tenn. 1898))). "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." Coley v. Bagley, 706 F.3d 741, 752 (6th Cir. 2013) (citations omitted). Accordingly, Claim 1.A will be denied.

### b.    Claim 1.B—Preliminary Hearing

There was an audio recording of Petitioner's preliminary hearing, and that recording was used to prepare a transcript. (See Doc. No. 12-24 at 3–29). Two witnesses testified at the hearing (Tiffany Reagan and Sherry Rooks). (See id.). The transcript reflects that there was a gap in the recording that began during the cross-examination of the second witness (Rooks) and ended during counsels' closing arguments. (See id. at 27). In Claim 1.B, Petitioner asserts that trial counsel should have filed a motion to dismiss the indictment and request a new preliminary hearing on this

basis, because the incomplete recording left counsel unable to impeach trial testimony that was not consistent with preliminary hearing testimony. (Doc. No. 1 at 19).

The TCCA rejected this claim, ruling that counsel's failure to file the requested motion was not ineffective because "it was unlikely that dismissal of the indictment would have been warranted and a new preliminary hearing ordered even if trial counsel had filed such a motion." Cartwright, 2020 WL 1867042, at *11. This ruling was reasonable. Under the version of the applicable rule of criminal procedure in effect during the lead up to Petitioner's trial in 2005, the State was required to preserve a preliminary hearing "by electronic recording or its equivalent." State v. Howard, No. E2007-00178-CCA-R3-PC, 2008 WL 1805758, at *21 (Tenn. Crim. App. Apr. 22, 2008) (quoting Tenn. R.Crim. P. 5.1(a) (2005)). Then-Rule 5.1(a)[2] "provide[d] no guidance as to the remedy to be applied for a violation of its terms," but the Tennessee Supreme Court had ruled that the State's failure to properly preserve a preliminary hearing recording did not require dismissal of an indictment and a new preliminary hearing if two conditions were met: (1) the defendant had access to the material evidence and testimony introduced at the hearing and (2) that testimony was subject to cross-examination. See State v. Graves, 126 S.W.3d 873, 877– 78 (Tenn. 2003). The TCCA considered those conditions met here, noting that: (1) the same attorney who represented Petitioner at trial also represented Petitioner at the preliminary hearing, and (2) Petitioner's counsel personally observed the direct preliminary-hearing testimony of both witnesses (Reagan and Rooks) before cross-examining them. Cartwright, 2020 WL 1867042, at *11–12. Indeed, at the post-conviction evidentiary hearing, counsel testified that he "knew exactly what was said at the preliminary hearing" going into trial. (Doc. No. 12-19 at 73–74). In these

---

[2] This Rule was amended in 2008, after Petitioner's trial. See Cartwright, 2020 WL 1867042, at *11.

circumstances, it was reasonable for the TCCA to rule that counsel did not provide ineffective assistance by failing to file a motion based on the condition of the preliminary hearing recording.

### c.      Claim 1.C—Opening Statement

In his opening statement, Petitioner's counsel remarked: "We feel like the proof will show that [the victim] was supposed to be on house arrest" on the night he was killed. <u>Cartwright</u>, 2020 WL 1867042, at *12. In Claim 1.C, Petitioner asserts that this statement was a promise to the jury, and that counsel was ineffective for not fulfilling that promise by presenting evidence regarding the victim's house arrest during trial. (Doc. No. 1 at 21).

The TCCA rejected this claim, first providing the full context of counsel's statement:

During opening statement, trial counsel made the following comments:

> Now . . . this was relatively late at night when all this started and there's a reason for that, ladies and gentlemen. We feel like the proof will show that [the victim] was supposed to be on house arrest. He was not supposed to be out at night, was supposed to be home. He had already committed an offense and [as] opposed to being in jail he was supposed to be at home and monitored.

The State lodged an objection: "We're going to object to that proof at this time, Your Honor. There's no foundation that's laid and it is disparaging to the victim." The resulting colloquy ensued:

> THE COURT: [Trial counsel], let's---
>
> [TRIAL COUNSEL]: Your Honor, I think that's proper.
>
> THE COURT: Well, I'm ruling that you move on. Let's not tarry on that issue.
>
> [TRIAL COUNSEL]: Okay.
>
> THE COURT: Move on.

No further reference was made about the victim's being on house arrest, and no evidence of such was put forth by the defense at trial.

<u>Cartwright</u>, 2020 WL 1867042, at *12.

12

The TCCA then decided that counsel's failure to follow up the house-arrest issue after opening statements did not amount to ineffective assistance:

> In certain circumstances, the failure to present evidence promised during the opening statement constitutes ineffective assistance of counsel. State v. Zimmerman, 823 S.W.2d 220, 225-26 (Tenn. Crim. App. 1991). "The trial attorney should only inform the jury of the evidence that he is sure he can prove . . . . His failure to keep [a] promise [to the jury] impairs his personal credibility." Id. at 225 (quotation omitted). Our supreme court noted that in Zimmerman, it was counsel's sudden, unwarranted change in trial strategy that resulted in the deficient performance. King v. State, 989 S.W.2d 319, 332 (Tenn. 1999) (citing Zimmerman, 823 S.W.2d at 224, 226). However, the supreme court held that a change in defense strategy did not rise to the level of the ineffective assistance of counsel when it occurred in response to surprise testimony or other change in the proceedings. See id.

> We have reviewed trial counsel's opening statement in this case. Trial counsel set out the defense theory and made assertions regarding the evidence, including that the victim was intoxicated on the evening in question, that "it was two drunks fighting," and that the Petitioner lacked premeditation. The trial court's admonishment to trial counsel not to "tarry on" the issue of the victim's house arrest was made in front of the jury after an objection by the State. Under these circumstances, trial counsel's failure to produce evidence of the victim's being on house arrest after promising it in his opening statement would not have significantly impaired his credibility. We do not believe that trial counsel's failure rose to the level of ineffective assistance of counsel. See Charles Ritter v. State, No. E2008-01278-CCA-R3-PC, 2009 WL 3711991, at *9 (Tenn. Crim. App. Nov. 6, 2009) (finding that counsel's failure to provide evidence of the victim's alternate source of sexual knowledge did not rise to the level of ineffective assistance of counsel because the defense strategy was not abandoned arbitrarily but in response to rulings from the trial court).

Cartwright, 2020 WL 1867042, at *12–13.

This ruling was reasonable. The Sixth Circuit has held that it may be ineffective "for counsel to promise testimony to the jury without first examining the availability and soundness of such testimony where counsel could, and should, have discovered these details prior to trial." Plummer v. Jackson, 491 F. App'x 671, 677 (6th Cir. 2012) (citing English v. Romanowski, 602 F.3d 714, 728 (6th Cir. 2010)). But the primary rationale for this holding is that a jury may take a dim view of a defendant and his counsel's credibility when a promise of presenting particular

13

evidence goes unfulfilled. See English, 602 F.3d at 729 ("The jury in this case must have wondered what happened to [a witness] after she was promised as a corroborating witness for [the defendant's] story, and the jury may well have counted this unfulfilled promise against [the defendant] and his attorney." (citation omitted)). And here, counsel abandoned the house arrest issue only after the court ruled that he "move on" and "not tarry on that issue" during opening statements. In other words, the jury was not left to wonder why counsel did not revisit that issue—it witnessed the court foreclose that approach in real time. Therefore, it was reasonable for the TCCA to rule that the jury did not view counsel's credibility as significantly impaired when counsel did not revisit the house arrest issue. See Kendricks v. Phillips, No. 1:16-CV-00350-JRG-SKL, 2019 WL 4757813, at *34 (E.D. Tenn. Sept. 30, 2019) ("As English notes, the damage from such unfulfilled promises occurs when the jury is left to infer why such testimony was not raised or believes that counsel lied." (citing English, 602 F.3d at 729)). So Claim 1.C will be denied.

### d.    Claim 1.D—Questioning the Medical Examiner

Dr. Feng Li, a medical examiner, performed the victim's autopsy. (Doc. No. 12-4 at 123–24). At trial, Dr. Li testified that there was evidence that the victim had sustained "multiple blunt force injuries" in several places on his body. (Id. at 126–29). When the State asked Dr. Li if he could tell "which of these injuries or which combination of these injuries was the cause of [the victim's] death," Dr. Li responded: "I would say that the combination of the injuries, all the injuries combined." (Id. at 129). In Claim 1.D, Petitioner asserts that trial counsel should have solicited testimony from Dr. Li on cross-examination to "clarify which injury . . . was the fatal one," as the victim's death could have resulted from being accidentally dropped on concrete rather than being deliberately beaten by Petitioner. (Doc. No. 1 at 23).

14

The TCCA thoroughly considered Dr. Li's testimony regarding the victim's cause of death—testimony in response to questions from the State, Petitioner's counsel, and the jury—before finding counsel was not ineffective in this regard:

> As noted above, Dr. Li testified that the victim suffered multiple injuries all over his body, that the victim's injuries were the result of blunt force, and that a combination of these injuries resulted in his death. Cartwright, 2008 WL 902093, at *4. The medical examiner "opined that the most severe injuries were the skull factures and hemorrhages" and that "[t]he victim's injuries were consistent with his head being stomped upon while he lay on the ground." Id. Furthermore, the medical examiner also classified the skull fractures and hemorrhages as "the most fatal in this case," and he surmised that the manner of death was "assault[ ] by others."
>
> On cross-examination by trial counsel, Dr. Li indicated that if he had "to pick one injury" leading to the victim's death, he would "say the bleeding inside the brain would" have been "the most serious." Dr. Li agreed that in the autopsy report, he "didn't specifically indicate which blow or which injury caused the death[.]" Dr. Li also agreed that his conclusions were "based upon all the circumstances that had been furnished" to him. Trial counsel also focused his cross-examination on the discrepancy in the victim's height, the victim's level of intoxication, and the victim's possible respiratory issues. Co-defendant's counsel next examined Dr. Li, and Dr. Li agreed that the victim's injuries were likewise consistent with being hit by a car.
>
> The jury also submitted questions for the medical examiner. Dr. Li was asked about possible injuries to the victim after death, possible causes of the congestion seen in the victim's lungs, if previous calculations of the victim's height and weight were available, whether the victim exhibited any signs of a panic attack, whether untrained individuals moving the victim or delay in his treatment precipitated the victim's death.
>
> When asked about a specific scenario, the medical examiner agreed that if a car fender were made of a "hard enough" material, the victim's head injuries were "consistent with blunt force trauma of his head being slammed into a car fender during a fight[.]" Dr. Li was shown a photograph of Ms. Rooks's fender, and he opined that it was "probably not" capable of producing the victim's skull fractures. It was also noted that Ms. Rooks's fender did not appear to exhibit much damage.
>
> Dr. Li was presented with another scenario, the jury's asking whether stomping the victim's head against the ground could have caused the victim's skull fractures, to which he replied it was "very hard to [have] cause[d] the skull fractures by the stomp alone." But, Dr. Li clarified that it was possible if done with sufficient force or repetition. Dr. Li also stated that the type of shoes worn would impact his decision and that the victim's injuries were "not likely" caused by someone wearing

15

tennis shoes. He was unable to say with any certainty whether the victim was "directly facing down" when he was injured. Nonetheless, Dr. Li affirmed his opinion that the manner of death was the victim's suffering multiple impacts while being assaulted by another individual or individuals, although he could not say for certain.

Most importantly, Dr. Li was presented with the following scenario: "If a body is carried face down and dropped on the concrete, could this cause a skull fracture?" Dr. Li replied, "Again, it varies from the height. I mean obviously if it's a very low height, it might not. If there's a, you know, high area and dropped to the ground, yeah, it could." Trial counsel then inquired, "And that would be more apt to cause a skull fracture than kicking or stomping with tennis shoes, would it not?" Dr. Li responded, "It could in theory. But again, based on the height." Upon further questioning by trial counsel, Dr. Li agreed that a person could "already be unconscious" before getting "their skull fractured from other separate incidences[.]"

Here, the medical examiner testified at length. Trial counsel asked the medical examiner if his conclusions were "based upon all the circumstances that had been furnished" to him, and the medical examiner answered affirmatively. Moreover, the jury's questions indicated that they had been supplied with evidence of several other possible causes for the victim's skull fractures and hemorrhaging in addition to the State's theory. Their questions were suggestive of conscious reflection. Although trial counsel did not ask the medical examiner about the victim's being dropped on the concrete during his initial cross-examination, the medical examiner did discuss the issue based upon the questions submitted by the jury. The jury had clearly been provided with evidence to support said theory prior to the medical examiner's testimony. Trial counsel, after the question, got Dr. Li to concede that such a scenario "could in theory" be "more apt to cause a skull fracture than kicking or stomping with tennis shoes" and that the injuries could have been received after the victim was already unconscious. Accordingly, we agree with the post-conviction court because we cannot say that the record supports either deficient performance or prejudice with regard to trial counsel's questioning of the medical examiner. See, e.g., Lonnie Lee Owens v. State, No. M2011-02188-CCA-R3-PC, 2013 WL 1384936, at *17 (Tenn. Crim. App. Apr. 4, 2013) (finding no deficiency when the medical examiner was cross-examined about an alternative cause of death).

Cartwright, 2020 WL 1867042, at *13–14.

This ruling was reasonable. Petitioner's core complaint is that counsel did not ask Dr. Li questions to bolster an "accidental-drop-as-cause-of-death" theory. Though counsel did not directly ask Dr. Li about the effect of an accidental drop during the initial cross-examination, this

topic was fully covered in the portion of Dr. Li's testimony prompted by questions from the jury. During that time, counsel asked a line of questions intended to foster doubt about the cause of death, namely whether the human body can "take a lot of punishment," whether "a minor blow placed at a specific location can be a cause of death," and whether the victim's cause of death "could have just as easily been a minor blow to a specific area" as it could have been a "major blow." (Doc. No. 12-5 at 6–7). Dr. Li's answers were, effectively, "yes, yes, and yes in theory," though Dr. Li emphasized his opinion that the victim sustained "so many injuries" that the cause of death was "a combination of the injuries." (Id. at 7). Further, as the TTCA noted, Dr. Li *did* answer a question specifically addressing the accidental-drop-as-cause-of-death theory; it just happened to be posed by the jury, rather than counsel. (Id. at 22 ("If a body is carried face down and dropped on the concrete, could this cause a skull fracture?")). Counsel followed up by asking if an "accidental[] drop[] . . . could cause a skull fracture," and Dr. Li stated, "it depends on how high the head or the distance from the head to the ground." (Id. at 22–23). Considering the totality of the testimony, it was reasonable for the TCCA to conclude that Petitioner failed to demonstrate both deficiency and prejudice regarding counsel's questioning of Dr. Li. See Jackson v. Bradshaw, 681 F.3d 753, 765 (6th Cir. 2012) ("Most cross-examinations can be improved but if that 'were the standard of constitutional effectiveness, few would be the counsel whose performance [pass] muster.'" (quoting Henderson v. Norris, 118 F.3d 1283, 1287 (8th Cir. 1997))). Claim 1.D, accordingly, will be denied.

### e. Claim 1.E—Call Petitioner's Co-Defendant to Testify

Petitioner and co-defendant Christopher Servo proceeded to trial together. After the close of proof, however, Servo pleaded guilty to an offense less serious than his charged offenses. In Claim 1.E, Petitioner asserts that trial counsel should have moved to re-open the proof and call

Servo to testify that he and Petitioner accidentally dropped the victim when moving him. (Doc.

No. 1 at 24).

The TCCA rejected this claim on deficiency and prejudice grounds:

Before trial, trial counsel was unable to talk with the co-defendant because the co-defendant was tried jointly with the Petitioner and represented by counsel. The co-defendant did not plead guilty until the proof had been closed and the jury was awaiting the trial court's formal instructions. Trial counsel, as he averred at the post-conviction hearing, would have been unaware of the exact details of the co-defendant's testimony at that stage of trial. His decision not to call the co-defendant was certainly reasonable.

Additionally, the defense had already been presented to the jury that the victim's injuries may have resulted from his being dropped or hitting his head on the concrete, that the co-defendant was involved, and that any such actions were accidental. Ms. Reagan testified at trial that she observed the Petitioner and the co-defendant carrying the victim from the yard onto the porch, and later testimony established that the porch was concrete. According to Ms. Reagan, the Petitioner was carrying the victim by his "head and shoulders," and the co-defendant had the victim by the legs before they dropped him, although Ms. Reagan believed any drop was "accidental." Ms. Reagan then observed the co-defendant dragging the victim face down by his feet onto the porch. Both doctors testified that the victim had injuries consistent with being dragged across the concrete. As noted above, the medical examiner was asked if the victim's injuries could have been caused during such a scenario, and he agreed that they in fact could. During closing argument, trial counsel argued that it was the co-defendant who dropped the victim and also that any drop was unintentional. Moreover, the co-defendant's testimony served little to bolster the theory that the victim was dropped on the concrete hard enough to cause his injuries. The co-defendant also testified inconsistently with other witnesses, which would have impacted his credibility. Accordingly, the Petitioner has shown neither deficient performance nor prejudice based upon trial counsel's failure to call the co-defendant to testify.

Cartwright, 2020 WL 1867042 at *15.

This ruling was reasonable. As to counsel's performance, he testified at the evidentiary

hearing that he did not call Servo as a witness because he was uncertain of Servo's expected

testimony. This uncertainly, counsel explained, was because Servo's legal status as a counseled

co-defendant prevented counsel from interviewing Servo prior to trial. See Cartwright, 2020 WL

1867042, at *7. Because counsel had a legitimate reason not to interview Servo before trial, the

strategic decision not to call Servo as a witness was presumptively sound. See Strickland, 466 U.S. at 689; Davis v. Lafler, 658 F.3d 525, 537–38 (6th Cir. 2011) (rejecting claim of ineffective assistance for failure to call witness who pleaded guilty to an offense stemming from the same incident giving rise to petitioner's charges, reasoning: "[Petitioner] has not produced any evidence that defense counsel failed to adequately investigate or consider the option of calling [the person who pleaded guilty] to testify. Without proof to the contrary, we must assume that counsel adequately considered the possibility, but ultimately decided that the best strategy was not to present [that person's] testimony." (citing Carter v. Mitchell, 443 F.3d 517, 532 (6th Cir. 2006))).

As to prejudice, the TCCA rightly noted that the jury heard Petitioner's sought-after testimony (that Petitioner and Servo accidentally dropped the victim), just from Tiffiney Reagan rather than Servo himself. (See Doc. No. 12-3 at 141–42 ("Q. Did you actually see [Servo] drag [the victim] in? A. I saw [Servo] drag [the victim] in. Q. Okay. But you testified earlier at the preliminary hearing that you thought that that was accidental, that they accidentally dropped--- A. Yes, I don't think that they just threw [the victim] down and started dragging him, no."); id. at 144–45 ("Q. [I]n your statement to Detective Sergeant Sells, isn't it true that you said Servo had a hold of [the victim's] legs and [Petitioner] had his arms, when they got to the steps they accidentally dropped [the victim], they grabbed [the victim] by his shorts and his shorts fell off, I was able to see how bad [the victim] was hurt so I ran inside and put some clothes on? A. Maybe I did say that.")). Therefore, it was reasonable for the TCCA to conclude that Petitioner failed to demonstrate prejudice in this regard. See Cobble v. Smith, 154 F. App'x 447, 451 (6th Cir. 2005) (noting that a habeas petitioner "has the burden of demonstrating prejudice," and that the "burden is a heavy one" (citing Smith v. Robbins, 528 U.S. 259, 285–86 (2000); Williams v. Taylor, 529 U.S. 362, 394 (2000))). Accordingly, Claim 1.E will be denied.

19

### f.  Claim 1.F—Cumulative Error

In Claim 1.F, Petitioner asserts that counsel's cumulative errors prejudiced the outcome of trial. (Doc. No. 1 at 25). The TCCA rejected this claim on post-conviction appeal by pointing to its rulings "that counsel was not deficient in any respect." Cartwright, 2020 WL 1867042, at *15. Regardless of this holding, however, binding Sixth Circuit authority holds that "cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006) (citing Moore v. Parker, 425 F.3d 250, 256 (6th Cir. 2005)); see also Lorraine v. Coyle, 291 F.3d 416, 447 (6th Cir. 2002); Sheppard v. Bagley, 657 F.3d 338, 348 (6th Cir. 2011).[3] So this claim is not a viable ground for relief in this proceeding.

### 2.  Insufficient Evidence

In Claim 2, Petitioner asserts that the State presented insufficient evidence of premeditation to support his first-degree murder conviction. (Doc. No. 1 at 34–40). The TCCA correctly identified the governing federal standard for this claim by citing Tennessee Supreme Court opinions that adopt the framework in Jackson v. Virginia, 443 U.S. 307 (1979). See Cartwright, 2008 WL 902093, at *4 (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994)).

"Under Jackson, habeas corpus relief is appropriate based on insufficient evidence only where the court finds, after viewing the evidence in the light most favorable to the prosecution,

---

[3] Recent unpublished Sixth Circuit opinions have cast some doubt on this holding. See, e.g., Teats v. Genovese, No. 22-5365, 2022 U.S. App. LEXIS 30775, at *9–10 (6th Cir. Nov. 4, 2022) ("Jurists of reason could disagree as to whether Teats's eighth claim, alleging cumulative error by trial and appellate counsel, is cognizable on habeas review."); Ramsey v. Phillips, No. 20-3452, 2020 WL 9423257, at *3 (6th Cir. Nov. 4, 2020) ("It is less clear whether jurists of reason could disagree with the district court's determination that Ramsey's fourth claim, in which he alleges cumulative error, is not cognizable on habeas review."). But it does not appear that the Sixth Circuit has revisited this holding or that the Supreme Court has since contradicted it, so the Court is bound to apply it.

that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Tucker v. Palmer, 541 F.3d 652, 656 (6th Cir. 2008) (quoting Parker v. Renico, 506 F.3d 444, 448 (6th Cir. 2007)). On federal habeas review, this standard "commands deference at two levels": "First, deference should be given to the trier-of-fact's verdict, as contemplated by Jackson; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." Id. (citing Parker, 506 F.3d at 448).

The TCCA rejected this claim as follows:

First degree murder is the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Tennessee Code Annotated section 39-13-202(d) provides:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). Therefore, in order to convict [Petitioner] of his indicted offense, the State was required to prove beyond a reasonable doubt that [Petitioner] killed the victim with "premeditation." "[W]hether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the" commission of the crime. State v. Billy Gene Debow, Sr., No. M1999-02678-CCA-R3-CD, 2000 WL 1137465, at *4 (Tenn. Crim. App. Aug. 2, 2000); see also State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Some relevant factors that tend to support the existence of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, calmness immediately after the killing," and evidence that the victim was retreating or attempting to escape when killed. Davidson, 121 S.W.3d at 614; Bland, 958 S.W.2d at 660; see also State v. West, 844 S.W.2d 144, 148 (Tenn. 1992). "[T]he fact that repeated blows (or shots) were inflicted on the victim is not sufficient, by itself, to establish first-degree murder." State v. Brown, 836 S.W.2d 530, 542 (Tenn. 1992).

Looking at the evidence in a light most favorable to the State, the evidence showed that the victim asked [Petitioner] to stop hitting [Josh] Cartwright, to which [Petitioner] responded by hitting the victim. [Petitioner] then received a phone call and asked the caller for assistance, apparently planning to continue this altercation. [Petitioner's] friend Servo arrived a short time later. After this brief intermission, and in response to no apparent action by the victim, [Petitioner] hit the victim again. The victim pleaded with [Petitioner] to stop, telling [Petitioner] that he had not done anything. [Petitioner] stripped the victim of his shirt and continued to beat him mercilessly, stomping repeatedly on his head. When Reagan yelled for [Petitioner] to stop, he would stop, walk away for a moment, and then go back to kicking and stomping on [Petitioner's] head. [Petitioner], with Servo's assistance, then dragged the victim to the porch where he pulled down his shorts. He dragged him to the shed, stuffing his unconscious body into the shed and then leaving. Shortly after the beating, [Petitioner] assisted the girls by loading the victim into the truck, but he told them to lie about what had happened and not to take the victim to the hospital if he had no pulse. The victim died of multiple blunt force trauma injuries, and he had several skull fractures and brain hemorrhages. [Petitioner] told Mr. Garrett that he was laughing while beating the victim. [Petitioner] left town in an apparent attempt to escape the police, who were looking for him at the time.

Whether the State established premeditation was primarily a jury question and based in this case on the credibility of the witnesses. Again, questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not an appellate court. [State v.] Morris, 24 S.W.3d [788,] 795 [Tenn. 2000]. Further, calmness immediately after a crime is relevant in determining the element of premeditation. Bland, 958 S.W.2d at 660. [Petitioner] was calm after the killing, having the wherewithal to hide the victim's body in the shed. He told the young women present not to take the victim to the hospital if he did not have a heartbeat, he told the women to lie if they did take the victim to the hospital, and [Petitioner] immediately made plans to leave the city. Further, while the fact that repeated blows were inflicted on the victim is not sufficient, by itself, to establish first-degree murder, see Brown, 836 S.W.2d at 542, it is still a consideration. [Petitioner] not only repeatedly hit, kicked, and stomped the victim, but he would walk away when Reagan pled for him to stop and then return to beating the victim. [Petitioner] also retold the story of the beating to Garrett, apparently bragging about the killing, telling Garrett he was laughing as he inflicted a savage beating. The jury heard the evidence and determined that there was sufficient evidence of premeditation. Upon the evidence in the record, we determine that a rational jury could have found that [Petitioner] was guilty of premeditated first degree murder. This issue is without merit.

Furthermore, the jury, by its verdict, rejected the contention that [Petitioner] acted in a state of passion required for a finding of voluntary manslaughter. The jury was instructed that "premeditation" is an act done after the exercise of reflection and judgment. See T.C.A. § 39–13–202(d). This necessarily excludes a state of passion. This issue is without merit.

22

<u>Cartwright</u>, 2008 WL 902093, at *5–6.

This ruling was not unreasonable. As Petitioner points out, some of the factors relied on to establish premeditation in other cases were not present here, as Petitioner did not use a weapon and there was no evidence of planning or a particular motive before the killing. (<u>See</u> Doc. No. 1 at 37). But as the TCCA noted, the State did present at least *some* evidence from which a jury could infer premeditation, including that Petitioner had time to reflect on the merciless beating he was inflicting on the victim during approximately three short breaks that were prompted by Tiffiney Reagan's pleas for Petitioner to stop, and that Petitioner was calm immediately after the killing—first attempting to hide the victim's body, then instructing others to lie about the victim. It is not the Court's role to "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." <u>Brown v. Konteh</u>, 567 F.3d 191, 205 (6th Cir. 2009) (citing <u>United States v. Hilliard</u>, 11 F.3d 618, 620 (6th Cir. 1993)). Rather, "[t]he jury in this case was convinced, and the only question under <u>Jackson</u> is whether that finding was so insupportable as to fall below the threshold of bare rationality." <u>Smith v. Cook</u>, 956 F.3d 377, 396 (6th Cir. 2020) (quoting <u>Coleman v. Johnson</u>, 566 U.S. 650, 656 (2012)). And even where this Court considers the jury verdict to be questionable in light of <u>Jackson</u>'s "low standard," a "state court's 'determination in turn is entitled to considerable deference under AEDPA." <u>Id.</u> (quoting <u>Coleman</u>, 566 U.S. at 656). Applying this doubly deferential standard of review, the Court concludes that the TCCA's resolution of this claim was not unreasonable. Accordingly, Claim 2 will be denied.

### B.      Procedurally Defaulted Claims

There are two claims remaining, both asserting ineffective assistance of trial counsel (IATC). In Claims 1.G and 1.H, respectively, Petitioner asserts that counsel was ineffective for failing to obtain a mental evaluation in pursuit of a diminished-capacity argument and raise the

defense of voluntary intoxication. (Doc. No. 1 at 27–30). Petitioner did not present these claims to the TCCA at any point, and no state court remedies remain for doing so. See Tenn. Code Ann. § 40-30-102(c) (establishing Tennessee's "one-petition" limitation on post-conviction relief); Hodges v. Colson, 727 F.3d 517, 530 (6th Cir. 2013) (explaining the three narrow circumstances in which a state prisoner may file a motion to reopen post-conviction proceedings, none of which applies to these claims (citing Fletcher v. Tennessee, 951 S.W.2d 378, 380–81 (Tenn. 1997))). Accordingly, these claims are procedurally defaulted. See Atkins, 792 F.3d at 657.

As cause to overcome this default, Petitioner argues that he received ineffective assistance of counsel in post-conviction proceedings. (See Doc. No. 1 at 26–27; Doc. No. 14 at 5–6). Based on the Supreme Court's ruling in Martinez v. Ryan, post-conviction counsel's alleged ineffectiveness may, in some circumstances, constitute the "cause" necessary to obtain review of a defaulted IATC claim. 566 U.S. at 17. But for the following reasons, Petitioner cannot rely on Martinez for that purpose here.

Petitioner raised Claim 1.G (regarding diminished capacity) at the trial court level of his post-conviction proceedings, asserting it in the amended post-conviction petition (Doc. No. 12-18 at 12–13) and presenting supporting evidence at the evidentiary hearing. (Doc. No. 12-19 at 13–20, 40–42, 69–70, 72–73, 80). The post-conviction court rejected this claim at the conclusion of the hearing (id. at 87–91) and in a written order. (Doc. No. 12-18 at 29). And Petitioner did not present this claim to the TCCA on post-conviction appeal. Martinez does not apply to IATC claims rejected by the post-conviction court but not raised on appeal. 566 U.S. at 16 ("The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings . . . ."); see also West v. Carpenter, 790 F.3d 693, 699 (6th Cir. 2015)

("[A]ttorney error at state post-conviction appellate proceedings cannot excuse procedural default."). Claim 1.G, therefore, is not subject to further review.

Claim 1.H concerns counsel's alleged failure to use a voluntary intoxication defense to negate the premeditation element of Petitioner's first-degree murder charge. (Doc. No. 1 at 30). Post-conviction counsel did not assert this claim at the trial court level of Petitioner's post-conviction proceedings, so Martinez could, in theory, provide a pathway for demonstrating cause.[4] But to excuse default under Martinez, the underlying IATC claim must be "substantial." Abdur'Rahman v. Carpenter, 805 F.3d 710, 713 (6th Cir. 2015) (quoting Martinez, 566 U.S. at 17). "A substantial claim is one that has some merit and is debatable among jurists of reason." Id. (citing Martinez, 566 U.S. at 14). "In the converse, a claim is insubstantial when 'it does not have any merit'" or "'is wholly without factual support.'" Porter v. Genovese, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting Martinez, 566 U.S. at 15–16). And Claim 1.H is without merit.

Prior to trial, counsel filed a motion to request that the jury be instructed on the defense of intoxication (Doc. No. 12-1 at 168–70) and argued in support of that motion before the court. (Doc. No. 12-21 at 215, 282–84). The court ruled that it "[m]ay or may not be charged, depending on the evidence, as with any other jury instructions." (Id. at 286). During opening argument, counsel told the jury that earlier on the night on the killing, Petitioner was at a nightclub on free beer night and "had too much to drink" (Doc. No. 12-2 at 46), leading to an incident of "two drunks fighting." (Id. at 51, 54). Counsel later elicited testimony from Lakeisha Darty that she saw Petitioner with a beer in his hand at the club. (Doc. No. 12-3 at 30–31). And the court ultimately found that there was sufficient evidence of Petitioner's intoxication to give the requested instruction. (See Doc. No.

---

[4] Post-conviction counsel did assert a claim of trial court error with regard to a voluntary intoxication jury instruction (Doc. No. 12-18 at 16), but that is not the same as an IATC claim.

12-6 at 145–47). Counsel then returned to the theme of Petitioner's intoxication during closing argument. (Doc. No. 12-7 at 22–23, 39, 45–46, 54). Accordingly, the record reflects that counsel pursued the very defense that Petitioner claims should have pursued, and Petitioner does not explain what else counsel could have done to convince the jury to accept it. Claim 1.H, therefore, is without merit.

## VI.    Conclusion

For these reasons, Petitioner is not entitled to relief under Section 2254 and this case will be dismissed. Petitioner cannot appeal this adverse ruling without a certificate of appealability (COA). Habeas Rule 11(a). A COA requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). "If the petition [is] denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" Dufresne v. Palmer, 876 F.3d 248, 253 (6th Cir. 2017) (quoting Slack, 529 U.S. at 484).

For the reasons stated throughout the Court's analysis, the Court concludes that Petitioner has not satisfied these standards and will deny a COA.

An appropriate Order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE